## HILBERT v. CITY OF VALLEJO et al.

Circuit Court of Appeals, Ninth Circuit.
May 9, 1927.

No. 5026.

1. Waters and water courses ⚌51—In California, right to flow of water is annexed to soil, and riparian proprietor has right to ordinary flow.

In California, the right to flow of water is annexed to soil, not as an easement or appurtenance, but as a parcel, and rights of riparian proprietor are not limited to body of water which flows in stream at period of greater scarcity, but include ordinary and usual flow of stream.

2. Waters and water courses ⚌85—Denial of injunction pendente lite to restrain impounding and diverting storm waters of creek held not abuse of discretion.

Trial court held not to have abused its discretionary power in denying injunction pendente lite restraining impounding storm waters of creek in reservoir, in view of evidence relative to usual and ordinary flow of stream.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California.

Action by Marie Robbins Hilbert against the City of Vallejo and others. From an order denying the application for an injunction pendente lite, plaintiff appeals. Affirmed.

Lloyd M. Robbins and Carey Van Fleet, both of San Francisco, Cal., for appellant.

Harry A. Gee, City Atty., of Vallejo, Cal., and Robert Duncan, E. J. Foulds, H. W. Hobbs, and Clarence A. Linn, all of San Francisco, Cal., for appellees.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

HUNT, Circuit Judge. This is an appeal from an order denying the application of Marie Robbins Hilbert, a citizen and resident of New York, for an injunction pendente lite. The application was heard upon a complaint, affidavits, and oral testimony. No answer was filed. The city of Vallejo, Cal., and its officials, and the Kaiser Paving Company, a California corporation, are defendants.

Plaintiff is owner of a large tract of land immediately adjacent to the channel and waters of Suisun creek, which rises partly in Gordon valley and partly in Wood-en valley, Napa county, California. Two branches of the creek flow south and unite in one stream in Napa county, thence flow south as Suisun creek, through Suisun valley, into Solano county. Suisun creek is a natural stream, with definite channels and banks. It has a considerable fall in the upper portion and empties into Suisun Bay.

The city of Vallejo chose a dam site at the entrance to Gordon valley, a mountainous valley on the Gordon valley branch of Suisun creek, and has constructed a dam of size sufficient to impound all of the waters of Gordon valley creek, intending to store, in the reservoir behind the dam, 10,000 acre feet of water (if that quantity is available from the storm waters), and to divert therefrom 5,058 acre feet of water annually.

The testimony of the plaintiff tended to show that, because of the variation in rainfall in the watersheds of Suisun creek, there will be many years of shortage in run-off and also many years of heavier run-off, with the result that in years of shortage there will be impounded all of the waters which would otherwise flow down Gordon valley; that the characteristic of the streams is that, upon rainfall of any consequence on the watersheds, greater increased flow would occur for a short period of time, but that thereafter the stream would either stop flowing entirely, or would flow in very small quantities; that it is uncertain when rainfall may occur, but that the heavy flow and then a recession is probable at least twice every winter or spring, and frequently during each winter and spring, and thus that such a performance is the normal and ordinary performance of the creek; that the usual and ordinary flow of Gordon valley creek and Suisun creek is not only the few second feet which flow therein during times when rainfall is not occurring on the watersheds thereof, but includes the greater flow thereof, as well as the lower flow of the creeks; and that therefore the usual and ordinary flow varies under conditions from a few second feet to varying amounts on the higher flows of 1,500 feet to 2,500 feet or more.

In behalf of defendants the testimony was to the effect that the city owns 2,856 acres within the watershed of Gordon valley creek, and that the lands run upstream above the dam constructed by the city; that the city owns riparian rights on Gordon valley creek, beginning at the dam site and extending down about 4,000 feet; that about 1922 the authorities of the state gave the city a permit to construct a dam and to divert

the waters from the watershed of Gordon valley to the city, and authorized the city to store waters of Gordon valley creek, not in excess of 10,000 acre feet of water at any one time, and to divert to the city annually water not in excess of 5,058.9 acre feet; that the watersheds furnishing water to Gordon valley creek and Wooden valley creek and Suisun creek lack heavy snowfalls and are very steep and mountainous, and that below the dam Gordon valley creek runs through a narrow and precipitous canyon several miles to a point where it joins Wooden valley creek; that Gordon valley creek and Suisun creek are narrow streams, with great fall in the elevation of streams and the water therein; that the rainfall occurs between December and April; that within the watershed at irregular times there are unusual rainstorms, at which times the waters of the creeks rise rapidly within a few hours, and become flood and freshet waters, and flow down the creeks with great velocity into Suisun Bay where they are lost; that when the rainstorms cease the waters fall, and within two to six hours have disappeared into the bay; that such flood and freshet waters continue only during such rainstorms, but that when the storms cease the waters return to their normal, usual, and ordinary flow; that defendant has constructed a by-pass at the dam, so that from 2 to 20 second feet can be let down as may be decreed to be the normal and usual flow; that the usual and ordinary flow of Gordon valley creek by the dam site does not exceed 3 second feet in December, January, and February, nor more than one second foot during March and April, and until the waters of the creek cease to flow at all; that it is not the intention of the city to, nor will it, impound any of the usual, ordinary, and customary flow of Gordon valley creek; and that no damage will result by impounding and diverting said waters.

The District Court concluded that the rainfall feeding the streams in Gordon valley begins about December 1st and continues until April, and that the usual and ordinary flow of Gordon valley creek does not exceed 3 second feet during December, January, and February, nor more than one second foot during March and April, and until the waters cease to flow; that at irregular intervals there are heavier rainfalls, when the waters of the creeks rise rapidly, become flood or freshet waters, flowing with great rapidity and within a few hours out of the valley into Suisun Bay, where they are lost to useful purposes.

[1] The established doctrine of the California decisions is that the right to the flow of water is annexed to the soil, not as an easement or appurtenance but as a parcel (Miller & Lux v. Madera Canal Co., 155 Cal. 59, 99 P. 502, 22 L. R. A. [N. S.] 391), and that the rights of a riparian proprietor are not limited to a body of water which flows in the stream at the period of greater scarcity, but include the ordinary and usual flow of the stream (Herminghaus v. Southern California Edison Co. [Cal. Sup. 1926] 252 P. 607, certiorari granted by United States Supreme Court, 47 S. Ct. 575, 71 L. Ed. ——, April 18, 1927). But, as has often happened before in California, in cases where riparian rights have been asserted, the controversy resolves itself into ascertaining what constitutes the usual and ordinary flow of the stream to which the lands are riparian.

Appellant's position is that under the evidence the admitted greatly increased flow of Gordon valley creek, though only occurring at times, is not less usual or ordinary than the much-diminished flow which comes after the rains and melting snows have run off, while the city contends that the waters which flow down during and soon after the unusual rainstorms are in excess of the ordinary and usual flow, are of no substantial benefit to appellant or her lands, and therefore may be taken without her consent and without compensation.

It being appropriate that we should conform our views to the decisions of the highest court of the state, we must give attention to Gallatin et al. v. Corning Irrigation Co. (1912) 163 Cal. 405, 126 P. 864, Ann. Cas. 1914A, 74, where the situation was quite like that in the case at bar. Gallatin and others owned lands abutting upon Elder creek and South Elder creek. They prayed for injunction against the irrigation company from diverting the water of South Elder creek so as to prevent it from flowing down the natural channel thereof and upon the lands of the plaintiffs; the allegation being that the waters were necessary for irrigation, and that the defendants intended to take from South Elder creek a large quantity of water, and to carry the same to nonriparian lands and outside the watersheds of the creek. Defendants denied that they claimed or intended to take any of the waters of the stream during the irrigating season, or any of the "ordinary flow" at any season, and averred that they intended only to take from South Elder creek "the flood waters flowing therein"

during December, January, February, and March of each year, to the extent of 5,000 inches, and carry the same to nonriparian lands to be used for irrigation; that during the winter months of each year the two creeks carried flood waters which flowed unobstructed by the lands of the plaintiffs and into the Sacramento river; that such flood waters were unnecessary for any beneficial purpose on the lands of the plaintiffs, and that, if the defendant did not take the proposed 5,000 inches, the same would run into the river and serve no useful purpose. The findings were to the effect that the normal and usual flow of South Elder creek, "including not only the flow in the dry season, but also the usual normal flood waters in the winter or wet season from rains and melting snows," equal to 5,000 inches, but that such quantity did not include the waters that came down the stream in times or seasons of unusual freshet and floods from rains and melting snows. It appeared that the irrigation company intended to construct a headgate which would receive and divert any of the "usual or normal flood waters of the creek," or any water therefrom, "except a part of the water that comes down during times of unusual freshets and floods which are sufficient to raise the surface of the stream above the level of the floor of the headgate." There was evidence too that at times there was a very heavy volume of water flowing down the creek, but the banks were high enough to confine the water along the whole course, except near the Sacramento river.

The court, through Justice Shaw, met the question whether or not "flood waters" of the creek proposed to be diverted could lawfully be taken from the stream for use upon nonriparian lands, and outside of the watershed of the stream, without consent of the riparian owners, and without compensating them therefor. "In other words," said the learned justice, "whether the right to have such flood waters flow down the stream in its usual course, under the circumstances here disclosed, is one of the ripariain rights attached to lands abutting upon the stream, as parcel thereof, which the owner of such lands may enforce against one who proposes to divert the same to nonriparian lands, where no use is made of such waters on the riparian land and no benefit accrues to riparian land from their passage over the bed of the stream, and no damage is caused to the riparian land from the proposed diversion." Many earlier decisions were cited, including San Joaquin, etc., Co. v. Fresno Flume Co., 158 Cal. 626, 112 P. 182, 35 L. R. A. (N. S.) 832 and Fifield v. Spring Valley Waterworks, 130 Cal. 552, 62 P. 1054, as establishing the rule that flood waters which are of no substantial benefit to the riparian owner or to his land, and are not used by him, "may be taken at will by any person who can lawfully gain access to the stream, and conduct it to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him." The court said: "They are not a part of the flow of the stream, which constitutes 'parcel' of his land, within the meaning of the law of riparian rights." There can be no misunderstanding of this language. It has clearly defined the rights of a riparian proprietor in excess waters like those in the present case, and in Horst v. New Blue Point Min. Co. (1918) 177 Cal. 631, 171 P. 417, the court, after quoting the language we have quoted from the Gallatin Case, went further and held that injunction will not be granted to restrain the diversion of water by a nonriparian proprietor at the instance of a lower riparian owner, when the amount diverted would not be used by the latter, but would greatly benefit the person diverting it.

Plaintiff, evidently appreciating the applicability of the doctrine of the decisions cited, argues that those cases have been overruled by Lindblom v. Round Valley Water Co. (1918) 178 Cal. 450, 173 P. 994, and Herminghaus v. Southern California Edison Co. (1926), supra. The Round Valley Case has little pertinence. The Round Valley Company maintained a reservoir impounding water at the head of a canyon, and sold water to consumers living below its dam. Lindblom owned certain mining property situated in North Canyon, below defendant's dam, and brought action on the theory that his land was riparian to a natural stream running through North Canyon, and that the defendant was controlling water impounded by its dam in a way to invade his riparian rights. The reservoir site was in a mountainous country that drained into Round Valley. A stream was formed which carried a substantial current during the season of rainfall and while the snows were melting, but in which the flow ceased as summer advanced. The water running into Round Valley consisted of the run-off from the usual and annually recurring fall of rain and snow. The decision was that such water, when running in a defined stream, is a water course to which riparian proprietors' rights attach—a conclusion not

inconsistent with the rule of the Gallatin Case. It is made plain that the court did not intend to disturb the Gallatin Case, for in reversing the judgment the opinion stated that the superior court had made its finding that North Canyon was not a water course, upon the apparent theory that the waters running down the ravine were flood waters, and hence no part of the stream to the flow of which the riparion owner was entitled, as had been held in Gallatin v. Corning Irrigation Co., supra, whereas the record did not support that theory.

In Herminghaus v. Southern California Edison Co., supra, the question involved rights to waters of the San Joaquin river, found by the court to be a natural stream, with well-defined channels and banks, which, with its tributaries, rises in the Sierra Nevada mountains, and which, in its natural flow of water, varies in the course of each and every year according to the seasons and annually recurring accretions which occur in their usual, expected, and accustomed seasons each year. Upon such findings the court held the conclusion to be inevitable that the waters of the river annually flowing therein before, during, and after the regularly recurring accretions in the volume thereof, constituted "the usual and ordinary flow of said river, and are in no sense 'storm' or 'flood' or 'vagrant' or 'enemy' waters, as these terms are understood in law." Earlier California decisions were referred to as fortifying the conclusion that the lands of the plaintiff were riparian to the San Joaquin river, entitled to the enjoyment of such riparian rights as they might be determined to be invested with in the entire flow of the waters of the river, "considering the same with its seasonal accretions as the usual and ordinary flow of said stream during each and every year."

The case is readily distinguished from Gallatin v. Corning Irrigation Co., supra, in that in the Gallatin Case the court found that waters such as flow down Suisun creek and its tributaries, and which defendant herein claims a right to take, were flood or excess waters, whereas in the Herminghaus Case the waters of San Joaquin river were expressly found not to be flood waters, and for that reason were not subject to the rules applicable to flood waters. This distinction is so evident that the court in the Herminghaus Case made no reference whatever to Gallatin v. Corning Irrigation Co., supra. In one important respect, however, the Herminghaus Case has a bearing, namely, in the discussion recognizing the fundamental rule

19 F.(2d)—33

of Modoc Land & Live Stock Co. v. Booth, 102 Cal. 151, 36 P. 431, that a riparian owner should not be permitted to demand as of right the intervention of a court of equity to restrain all persons who are not riparian owners from diverting any water from the stream at points above him simply because he wishes to see the stream flow by or through his lands undiminished and unobstructed. Weil on Water Rights, pp. 880, 881.

[2] We cannot say at this stage of the case that the District Court erred in its deductions from the somewhat conflicting testimony submitted to it, or abused its discretionary power in denying injunction pendente lite. Miller & Lux v. Madera Canal & Irr. Co., 155 Cal. 59, 62, 99 P. 502, 22 L. R. A. (N. S.) 391.

Affirmed.